UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 07-61395 CIV ZLOCH/SNOW

FREDRICK BLACK,

       Plaintiff

v.

APPLE, INC., a
foreign corporation,

       Defendant.

_____/

**DEFENDANT'S MOTION TO DISMISS
AND MEMORANDUM OF LAW IN SUPPORT**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, defendant Apple Inc. (Apple) hereby moves this Court for an order dismissing the complaint with prejudice for failure to state a claim upon which relief can be granted.[1] The complaint claims in substance that Apple should have used Microsoft's anti-piracy technology in its products so that they would be compatible with competitors' products. But neither the Florida antitrust law nor the Florida Unfair and Deceptive Trade Practices Act requires a manufacturer to make its products compatible with those of a competitor.

The antitrust laws are designed to foster innovation and competition – concepts that Apple's iPod and its iTunes Store epitomize. The iTunes Store was introduced in 2003 as a pioneering, revolutionary solution to the problem of music piracy. It enables consumers to buy digital music and video over the Internet – lawfully, conveniently, and inexpensively. It provides a competitive alternative not just to traditional outlets for music like brick-and-mortar

---

[1] Apple is filing herewith a companion motion to transfer this action to the Northern District of California or to stay it.

music stores but also to online peer-to-peer services like Napster that were declared illegal (*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)) and other legal online stores. The iPod, introduced two years earlier, is Apple's highly popular portable digital music player which, in competition with MP3 players by Sony, Rio, Nokia, and any number of other companies, has won accolades worldwide.

The thrust of the complaint is that Apple uses its own proprietary anti-piracy technology rather than adopting Microsoft's technology. The complaint does not question that the major record labels required Apple and other online music stores to use anti-piracy technology as a condition for licensing their music for distribution by the online stores. Indeed, use of such technology (generally referred to as digital rights management or DRM) is what made legal online stores possible in the first place, and separated them from the illegal peer-to-peer services. And the complaint acknowledges that all online music stores use DRM. Instead, the essence of the complaint is that Apple supposedly had a duty under the antitrust laws to do whatever was necessary to make music and videos sold by Apple compatible with competitors' MP3 players and to ensure that iPods could play content from competing online stores that use Microsoft's DRM. According to plaintiff, to achieve this end, Apple should not have developed its own DRM but instead should have used Microsoft's.[2]

Plaintiff's theory, however, finds no support in the antitrust laws. Those laws do not limit a company to introducing new products only if they are interoperable with existing or later-introduced competing products. Nor do the antitrust laws require a company to build its products

---

[2] Perhaps mindful of the absurdity of alleging that the antitrust laws require a company to use Microsoft's software rather than compete with it, the complaint studiously avoids mentioning Microsoft by name. It refers to the competing technology at issue simply by the undefined acronym WMA – without disclosing that WMA is Microsoft's Windows Media Audio technology. *See* http://www.microsoft.com/windows/windowsmedia/forpros/drm/faq.aspx.

around Microsoft's or any other company's technology. In short, it would stand the antitrust laws on their head to penalize Apple for developing superior technology rather than simply settling for Microsoft's existing technology. Thus, the complaint should be dismissed for failure to state a claim.

## THE COMPLAINT

The relevant allegations of the complaint, taken as true only for purposes of this motion, are summarized as follows: Using the Internet, consumers download digital music and video to play on computers and portable digital media players. ¶¶ 27-28, 39. To protect against piracy of digital files, online music stores use an encoding system referred to as DRM. ¶ 37. The most widely used DRM is "the WMA system" (*id.*), which, as noted, refers to Microsoft's Windows Media Audio DRM. In other words, most portable digital player manufacturers have licensed WMA from Microsoft so their players can play files encoded with that technology.

Instead of licensing WMA from Microsoft, Apple developed its own DRM called FairPlay, which it has not licensed to others. ¶¶ 38-40. The result is that Microsoft licensees' products are allegedly incompatible with Apple's: WMA-encoded music cannot be played on Apple's iPod players, and music from Apple's iTS cannot be played on WMA players. ¶¶ 39, 45-46.[3] Black further alleges that Apple "disables" the chips used in iPods so that they do not support WMA (¶¶ 43-44), which is another way of saying that Apple does not license Microsoft's DRM.

---

[3] Although this motion does not turn on this fact, music from other online stores can in fact be played on an iPod simply by copying the music to a CD and back to a computer. This "burning/ripping" method, which removes DRM, is widely used. *See, e.g.,* http://mp3.about.com/od/ripandburncds/Rip_and_Burn_Digital_Music_and_CDs.htm. In addition, record labels are increasingly permitting legal online stores to sell DRM-free music, which can be played on most portable digital music players regardless of the store from which it was downloaded. *See, e.g.,* http://www.emigroup.com/Press/2007/press18.htm, http://new.umusic.com/News.aspx?NewsId=539.

Black purchased an iPod from Apple in November 2004 and acquired an iPod Nano by redeeming points in an awards program. ¶12. He also purchased music from iTS. ¶11. Black, however, does not allege that he did not want to purchase these items from Apple or was forced to do so, that Apple refused to sell him an iPod unless he purchased music from iTS, or *vice versa*, that he is unable to use the iPod to play music obtained from other sources such as his CD collection, or that he is unable to play his iTS music on his computer, or burn it to a CD and play it anywhere he wants, including on a competitor's portable device.[4] Nor does he allege that Apple engaged in any conduct that deceived, or was likely to deceive, him or any other consumer. He alleges only that he and other consumers are "frustrated by the restrictions put in place by" Apple (¶¶ 23, 47), and that a consumer whose iPod is lost or broken is "forced to either purchase another iPod or not be able to use their purchased music on the new digital music player" (although he does not allege that this has happened to him). ¶ 24.

Black asserts that Apple's conduct violates FDUTPA, Fl. Stat. §501.201 *et seq.* (Count I), and constitutes monopolization (Count II) and/or attempted monopolization (Count III) under the Florida Antitrust Act, Fl. Stat. §542.19.[5]

## ARGUMENT

Underlying Black's claims is the flawed premise that the antitrust laws somehow should preclude Apple from competing with Microsoft in developing anti-piracy technology. Under plaintiff's theory, Apple would be forced to adopt Microsoft's technology and design and build Apple's products with Microsoft's software. Not only would this make Apple dependent on

---

[4] Black acknowledges, in fact, that iTS music can be played on a computer. ¶ 39.

[5] Florida's antitrust law is interpreted and applied according to the same body of case law as federal antitrust law. *See, e.g., All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n. 11 (11th Cir. 1998) ("Federal and Florida antitrust laws are analyzed under the same rules and case law.")

whatever level of support Microsoft chose to provide for its software but it would prevent Apple from ever attempting to develop better technology. Plaintiff's theory would stop innovation and competition cold. It is contrary not only to common sense and the underlying purpose of the antitrust laws but also to the holding in *Verizon Commc'ns, Inc. v. Law Offices of Curtis v. Trinko, LLP,* 540 U.S. 398 (2004), that a company's refusal to do business with a competitor does not violate the antitrust laws. In addition, his conclusory tying allegations are insufficient as a matter of law. An essential element of unlawful tying is a seller's refusal to sell one product unless the consumer purchases a second, unwanted product. Black does not, and cannot, allege that Apple refuses to sell iPods and iTS content separately. Moreover, where the underlying conduct leading to the alleged tie (*i.e.*, refusing to deal with Microsoft) is protected by the antitrust laws, it would be contrary to the purpose of the antitrust laws to expand tying law to prohibit that conduct. Black's unfair or deceptive trade practice claim fails for the same reasons and because he does not allege that Apple has engaged in any conduct that is deceptive or likely to mislead. Nor does Black allege that he himself was deceived or misled by anything.

I.   **BLACK'S MONOPOLIZATION ALLEGATIONS FAIL TO STATE A CLAIM.**

A monopolization claim requires the plaintiff to allege facts sufficient to show that the defendant has monopoly power in relevant markets, willfully acquired or maintained that power, and caused antitrust injury. *Okeelanta Power Ltd. P'ship v. Florida Power & Light Co.,* 766 So. 2d 264, 267 (2000). This motion focuses on the second requirement, willful acquisition or maintenance,[6] which the courts have interpreted to require allegations of specific anticompetitive

---

[6] Black's allegations of monopoly power and relevant markets, although not a subject of this motion to dismiss, are false. ¶¶ 26-29, 32-36. For example, legal online music stores clearly compete with illegal online services and traditional brick-and-mortar stores, and online video stores clearly compete with brick-and-mortar video stores. In addition, market shares do not establish market power in nascent, emerging businesses. *See, e.g., Metro Mobile CTS, Inc. v. New Vector Commc'ns, Inc.,* 892 F. 2d 62, 63 (9th Cir. 1989).

conduct such as predatory pricing (*see, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)), refusals-to-deal (*see, e.g., Trinko*), or some other cognizable unlawful exclusionary conduct (*see, e.g., Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (product disparagement)).

The first step in analyzing a plaintiff's claim is to determine the type of exclusionary conduct alleged and apply the standards applicable to that type of conduct. Here, the claim of exclusionary conduct is necessarily a claim of refusal-to-deal. Black does not challenge Apple's decision to use some form of DRM. Indeed, he acknowledges that the online music industry has made a practice of using DRM to prevent piracy. ¶ 37.[7] What Black challenges is Apple's decision to develop its own DRM rather than build its products around Microsoft's WMA. ¶ 41. His theory is that because most online music stores and digital music player manufacturers now use WMA, Apple should be forced to do the same. ¶¶ 37-38, 45-46. Alternatively, Black claims that Apple should be forced to license its own DRM, called FairPlay, to other digital player manufacturers. ¶ 40. Because his theory would require Apple to enter into a transaction with competitors (either by in-licensing Microsoft's DRM or out-licensing its own DRM), Black's claim is necessarily a refusal-to-deal claim and must be analyzed under the *Trinko* standards.[8]

---

[7] As alleged in the July 21, 2006 complaint in related proceedings currently pending in the Federal District Court for the Northern District of California (consolidated under the caption *The Apple iPod iTunes Antitrust Litigation,* No. C05-00037 JW), the major record labels conditioned the licensing of their music to online stores on the stores' use of DRM from the outset. Tucker Compl. ¶ 34 (attached hereto as Exhibit A).

[8] Black's additional allegation that Apple could "negotiate inter cooperative agreements to use a DRM system that is used throughout the relevant markets ...." (¶ 42) is just another way of saying that Apple must deal with Microsoft. As he alleges elsewhere, Microsoft's DRM is the most widely used DRM. ¶ 37. But even if this were intended as a reference to something other than Microsoft, it would require Apple to enter into a transaction with *some* other company, so it does not alter the refusal-to-deal nature of Black's claim.

### A. Under *Trinko*, Refusal To Deal Claims Are Actionable Only Under Narrow Circumstances Not Present Here.

Apple's decision to use its own DRM rather than license Microsoft's is not an unlawful exclusionary act. No antitrust court has ever condemned a company for choosing to innovate and develop its own technology rather than paying a competitor for use of its technology. Far from condemning Apple's refusal to deal with Microsoft, the antitrust laws encourage companies to compete rather than cooperate. Those laws safeguard the incentive to innovate, which is a cornerstone of our economic system. The rationale is that long-term consumer welfare is enhanced by competition and innovation even if some products are incompatible as a result.

In *Trinko*, in dismissing a monopolization complaint at the pleading stage, the Supreme Court held that, subject to very narrow exceptions, companies have no antitrust duty to cooperate with competitors even if consumers would allegedly benefit from the cooperation. *Trinko*, 540 U.S. at 408. The Court rested its decision on three policy grounds. *Id.* at 407-08. First, requiring companies to cooperate is in "some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Id.* Second, "[e]nforced sharing . . . requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill-suited." *Id.* at 408. Finally, "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Id.*

The same policy reasons apply here. First, forcing Apple to deal with others "may lessen the incentive" for Apple to innovate. *Trinko*, 540 U.S. at 408.[9] Indeed, it would stop such

---

[9] *Trinko* makes clear that even a monopolist is encouraged to innovate and invest so this principle would apply even if Apple were somehow able to monopolize any relevant market. In reality, as noted earlier, no company could monopolize the sale of music or playing devices given the ease of entry and large number of existing and potential competitors.

innovation in its tracks, because Apple would have to use Microsoft's technology rather than inventing its own. Apple's ability to provide the seamless iPod/iTS integration valued by consumers would depend on how well or poorly Microsoft's technology works.[10] Second, forcing Apple to deal with Microsoft would require antitrust courts "to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill-suited." *Id.* If Apple were required to license Microsoft's WMA, at what price and on what terms, and what standards would this Court use? Third, theoretically at least, forcing Apple to negotiate with rivals "may facilitate the supreme evil of antitrust: collusion." *Id.*

The *Trinko* Court stressed that the exceptions in which a refusal to cooperate with rivals may constitute anticompetitive conduct are narrow. *Id.* at 408. The exception permitted in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), was "at or near the outer boundary of § 2 liability." *Id.* at 409. In *Aspen Skiing* the defendant owner of three of four mountains in the Aspen area had cooperated with the plaintiff, who owned the fourth mountain, to offer joint, multi-day, all-area ski tickets. After years of cooperating, defendant canceled the joint tickets and refused even to permit plaintiff to buy defendant's tickets at retail prices. *Aspen Skiing*, 472 U.S. at 593-94. On those facts, the *Aspen Skiing* Court upheld a verdict for plaintiff.

The *Trinko* Court contrasted the facts before it with the key aspects of *Aspen Skiing* and concluded that **unilateral termination of a voluntary course of dealing is a requirement** for a valid refusal-to-deal claim. This was central to the Court's decision because the prior course of dealing in *Aspen Skiing* was presumed to be profitable and abandoning it suggested a willingness

---

[10] Even worse, under plaintiff's theory, Apple's supposed duty to deal with Microsoft would arise not at the outset when Apple was designing and launching its products but only when Apple's products became successful enough to command "market power." At that point, Apple would be required to change its technology to become compatible with competitors. Such an obligation would deter innovation from the outset.

to forsake short-term profits to achieve an anticompetitive end. *Trinko*, 540 U.S. at 409. By contrast, in *Trinko,* there was no allegation that "Verizon voluntarily engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion." *Id.* Here, as in *Trinko* (and unlike *Aspen Skiing*) Black does not allege that Apple cut off a voluntary course of dealing. He simply asserts that Apple has refused to deal with Microsoft, period. This dooms his claim. *See, e.g., In re Elevator Antitrust Litigation*, No. 06-3128-CV, 2007 WL 2471805, at *4 (2d Cir. Sept. 4, 2007) ("But because plaintiffs do not allege that defendants terminated any prior course of dealing – the sole exception to the broad right of a firm to refuse to deal with its competitors – the allegations are insufficient to state a unilateral-monopolization claim."); *Schor v. Abbott Labs.*, 457 F.3d 608, 614 (7th Cir. 2006).

### B. The Eleventh Circuit Has Rejected Judge Ware's Interpretation Of *Trinko*.

In the related California proceedings, Judge Ware declined to accept Apple's argument that *Trinko* limits refusal to deal claims to those involving unilateral termination of a voluntary course of dealing. *Tucker v. Apple Computer, Inc.*, 493 F. Supp. 2d 1090, 1100. In his view, the *Trinko* Court looked to the preexisting relationship in *Aspen Skiing* only as evidence of bad intent. *Id.* The Eleventh Circuit, however, has rejected this interpretation. In *Covad Commc'ns Co. v BellSouth Corp.*, 374 F.3d 1044, 1049 (11th Cir. 2004), the court considered whether Covad, a DSL internet service provider, stated a refusal to deal claim against BellSouth under the *Aspen Skiing* "limited exception." The court concluded that it did not, based in part on the finding that the two companies had not been engaged in a voluntary course of dealing. *Id.* In reaching that conclusion, the Court stated: "*Trinko* now effectively makes the unilateral termination of a voluntary course of dealing **a requirement** for a valid refusal-to-deal claim under *Aspen*." *Id.* (emphasis added).

The law of this circuit is thus directly contrary to Judge Ware's view.[11] The leading antitrust treatise, relied on extensively in *Trinko*, similarly recognizes that the critical fact in *Aspen Skiing* was the "defendant's abandonment of a joint venture initially entered into voluntarily. The Court did not impose a prospective duty to deal where no such dealing had occurred previously, and there is no reason for thinking that it would have done so." IIIA P. Areeda & H. Hovenkamp, *Antitrust Law,* p. 190, ¶ 772c3 (2d ed. 2002). The fact that *Trinko* arose on a motion to dismiss buttresses the conclusion that it was adopting a bright-line test requiring a voluntary, pre-existing course of dealing. If the issue was simply whether the plaintiff alleged anti-competitive intent, *Trinko* would have been decided in plaintiff's favor.

### C. Black's Chip "Disabling" Allegations Do Not Alter The Character Of His Claim.

Black's allegation that Apple "disables" the chips used in iPods so that they will not support WMA (¶¶ 43-44) adds nothing material even if true (which it is not). He does not allege that the chip supports WMA without obtaining a license from Microsoft or that Apple has had any prior course of dealing with Microsoft with respect to WMA. Indeed, the complaint makes clear that Apple could not use or "support" WMA without obtaining a license from the software's owner, Microsoft. ¶ 41. Thus it remains a claim that Apple has refused to deal with Microsoft by obtaining a license and designing its products around WMA. It also remains defective as a matter of law because, as discussed, absent a voluntary preexisting course of

---

[11] Indeed, so is the Ninth Circuit's. Even before *Trinko*, the Ninth Circuit had recognized that the linchpin of refusal-to-deal liability under *Aspen Skiing* is that the defendant was engaged in a prior voluntary course of dealing. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1211 (9th Cir. 1997) ("Like the Supreme Court in *Aspen Skiing*, we are faced with a situation in which a monopolist made a conscious choice to change an established pattern of distribution…."); *SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 786 (9th Cir. 1996) ("Unlike the defendant skiing company in *Aspen*, Delta Dental did not discontinue a market arrangement with SmileCare.").

dealing, Apple has no antitrust duty to do business with Microsoft, and no antitrust claim arises from its choice not to do so.

In *Tucker*, Judge Ware held that a similar chip "disabling" allegation (and a related claim concerning "technological restrictions," which is just a pejorative way of referring to anti-piracy technology) successfully avoided the *Trinko* refusal-to-deal standard. 493 F. Supp. 2d at 1099-101. But all these claims, however phrased, necessarily rest on the erroneous assumption that Apple is obligated to license a competitor's anti-piracy technology or license FairPlay to its competitors. Under *Trinko*, no such obligation exists, and any alleged inference of anticompetitive intent is legally irrelevant.

**D. The Antitrust Laws Do Not Obligate Apple To License FairPlay.**

Courts have repeatedly held that the antitrust laws do not require even a dominant company to compete against itself with its own technology by licensing its intellectual property to rivals. That was well-established even before *Trinko*. In *Independent Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1326 (Fed. Cir. 2000), the Federal Circuit held that refusals to license are beyond the reach of the antitrust laws, absent a showing of tying, sham litigation, or fraud in obtaining the intellectual property rights.[12] Any resulting market power "does not 'impose on the intellectual property owner an obligation to license the use of that property to others.'" *Id.* (citation omitted). Moreover, as noted, after *Trinko*, any refusal-to-deal claim requires proof of a pre-existing voluntary course of dealing. In short, Black's allegation that Apple has consistently refused to license its software to others is insufficient as a matter of law and should be dismissed.

His attempt to monopolize claim fails for the same reason. An essential element is "predatory or anticompetitive conduct." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456

---

[12] Here, as noted, Black fails to allege the essential elements of tying.

(1993). He does not allege predatory conduct, and the only allegedly anticompetitive conduct is refusal to deal. For the same reasons that Apple's refusal to deal with Microsoft cannot be found exclusionary, it cannot be deemed anticompetitive. *See Trinko*, 540 U.S. at 409.

II.   **BLACK'S TYING ALLEGATIONS FAIL TO STATE A CLAIM.**

Black does not allege a stand-alone claim for unlawful tying. Instead, he treats tying as an exclusionary act for his monopolization and attempted monopolization claims. Whether viewed as a separate claim or as part of the claims that are pled, the allegations fail to state a claim. Tying law addresses a narrow category of anticompetitive conduct where a seller offers to sell a product for which it has market power **only** if consumers also agree to buy a second, unwanted product. As the Supreme Court describes it, a tying agreement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958). "This circuit has clearly stated that 'a tying arrangement is an 'agreement by a party *to sell one product* [the tying product] but only on the condition that the buyer also purchases a different (or tied ) product.'"). *T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 822 (11th Cir. 1991) (emphasis in original) (citations omitted); *see also Tic-X-Press, Inc. v. The Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1415 (11th Cir. 1987("[t]he plaintiff must establish that the seller *forced or coerced* the buyer into purchasing the tied product") (emphasis in original). Here, plaintiff does not, and cannot consistent with Rule 11, meet this standard. There is no allegation that Apple refuses to sell an iPod unless the customer also buys music from the iTunes Store, or *vice versa*.

Nor is there any basis to extend the tying law to force a company to make its products compatible with competing products or to prevent a company from developing and using its own technology. Expanding tying law in that way would discourage innovation by making the

development of complementary products more expensive, if not impossible, and it would turn antitrust courts into "central planners," requiring them to determine whose technology should be the industry standard and to specify "the proper price, quantity, and other terms of dealing—a role for which they are ill-suited." *Trinko*, 540 U.S. at 408. Doing it here would also improperly serve to enhance Microsoft's dominance of the DRM market.

### A.  Black Does Not Allege that Apple Coerced Him to Buy Anything.

"[F]or a tie to exist a seller must withhold product A unless the buyer also selects product B." *Marquette Elecs.*, 931 F.2d at 822. This element of forcing the consumer to purchase a second, unwanted product is essential to a tying claim. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 n.17 (1984) ("[W]here the buyer is free to take either product by itself there is no tying problem.").[13] No tying exists where the buyer purchases the second product on account of its "intrinsic superiority" rather than any coercion by the seller. *North Pac. Ry Co.*, 356 U.S. at 10-11. The threshold inquiry, therefore, is whether Apple refused to sell an iPod to plaintiff unless he also bought music from iTS, or *vice versa*.

Here, Black fails at the threshold. Although he alleges that he bought an iPod and music from iTS, he does not allege that he bought both at the same time, much less that Apple refused to sell one without the other. If Apple had refused to sell them separately, it would have been simple for him to allege that. Tellingly, he fails to do so.[14] Instead, he merely claims to be

---

[13] *In accord, Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 991 (4th Cir. 1990) ("For a tying arrangement ... to exist, the seller must coerce the buyer into purchasing the tied product."); *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 685 (2d Cir. 1982) ("Actual coercion by the seller ... is an indispensable element of a tying violation."); *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981) (same); *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, 1218-19 (3d Cir. 1976) (same); *Belliston v. Texaco, Inc.*, 455 F.2d 175, 184 (10th Cir. 1972) (no tying violation absent "coercive conduct").

[14] Any such allegation would be nonsensical given the volume of iPods sold in the eighteen months before iTS was launched and the common knowledge that anyone can buy an

"frustrated by the restrictions put in place by [Apple]." ¶¶ 23, 47. But claiming to be frustrated by how a product works is not the same as alleging that they were not separately available. His failure to allege this essential element is fatal to his claim. *Tic-X-Press,* 815 F.2d at 1417 ("two products are not tied as a matter of antitrust law if the buyer voluntarily purchases the tied product").

      **B.    Tying Law Was Never Intended And Has Never Been Applied To Prevent Development Of Products That Work Well Together.**

Black's additional allegation that if an "iPod breaks or is lost, the consumer is forced to repurchase an iPod from Defendant or lose the use of the iTunes content as it was intended to be used" does not save his tying claim. ¶ 54. This still is not an allegation that Apple conditions the sale of iTS content on the purchase of an iPod, or *vice versa.* This allegation merely describes the advantages inherent in making complementary accessories for any product. Having bought a year's supply of razor blades or print cartridges that work with a particular model of razor or printer, a consumer may be more likely to replace the lost razor or broken printer with the same brand. The same is true of a consumer with numerous games for an X-Box or Nintendo player. This has nothing to do with market power or the law of tying. *Cf. Eastman Kodak v. Image Tech. Servs., Inc.,* 504 U.S. 451, 497-98 (1992) (Scalia, J., dissenting) (circumstantial leverage created by a consumer's reluctance to walk away from his initial investment in a device is of little or no antitrust concern). It is not a matter of the manufacturer refusing to sell one product unless the purchaser buys an unwanted product, which is the only

---

(continued...)

iPod with no strings attached. Countless consumers buy iTS music and play it on personal computers without ever purchasing an iPod or any other portable digital player. Countless others buy iPods and never buy music from iTS. That some people, like Black, choose to buy both does not constitute unlawful tying.

conduct that the law of tying addresses. Moreover, Black does not allege that he personally was forced to purchase an iPod under such circumstances. Nor does he deny that there are multiple ways to play music purchased from iTS, not a single intended use.

A technological relationship between two products is not unlawful tying. In *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983), the Ninth Circuit considered a tying challenge to Kodak's decision to introduce its Instamatic camera, a new film and developing process, and the equipment necessary to process the new film. A competitor alleged an unlawful tying arrangement because the new Kodak system was "incompatible" with existing products. *Id.* at 544. Affirming dismissal for failure to state a claim, the court held that a "technological interrelationship among complementary products" does not constitute the type of forced purchase that constitute unlawful tying. *Id.* at 542. The claim that "effective use" of one product "necessitates purchase of some or all of the others" is insufficient where the products are separately available for purchase. *Id.* at 543. Any other conclusion would "unjustifiably deter the development and introduction of those new technologies so essential to the continued progress of our economy." *Id.* "Quite obviously, a firm that pioneers new technology will often introduce the first of a new product type along with related, ancillary products that can only be utilized effectively with the newly developed technology." *Id.* at 542. In short, "the introduction of technologically related products, even if incompatible with the products offered by competitors, is alone neither a predatory nor anticompetitive act." *Id.* at 544.

In accord is *Innovation Data Processing, Inc. v. IBM Corp.*, 585 F. Supp. 1470 (D.N.J. 1984), in which the key issue was whether IBM had tied sales of its data recovery software (DFDSS) to a package of software updates (IPOJ) by including it in the integrated version of IPOJ. The competitor alleged that although the various pieces of software could be licensed

separately, IBM had tied DFDSS to IPOJ "as a practical matter" because customers would want "to avoid the technical and administrative problems" of licensing competing data recovery software. *Id.* at 1474. The district court granted summary judgment to IBM:

> [A]s a matter of law, in the absence of evidence that the purchase of the alleged tied product was required as a condition of sale of the alleged tying product—rather than merely as a prerequisite for practical and effective use of the tying product—[plaintiff] has failed to show the requisite coercion necessary to establish a per se illegal tying arrangement.

*Id.* at 1475-76.

Because Black does not, and cannot, allege that Apple conditions the sale of iPods on purchases of iTS content (or *vice versa*), his tying claim fails as a matter of law.

### C. Black's Tying Theory Is Wrong Because It Would Force Apple To Do Business With Microsoft.

As noted, Black does not allege that Apple conditions the sale of iPods on purchase of iTS content or *vice versa*. Instead, he claims that Apple's products are incompatible with competitor products because the music industry requires DRM and Apple and its competitors use different DRM technologies. ¶¶ 37-42. But tying law has never been applied to prevent a company from using the technology of its choice. This can readily be seen by looking at what a defendant has to do to avoid an unlawful tie. In the paradigm tying case, the defendant can comply with the law by offering the two products for sale separately rather than conditioning the sale of the wanted item on purchase of the unwanted item. In this important sense, the remedy in a tying case is, as the Supreme Court said in a different context, "amenable to a remedy that does not require judicial estimation of free-market forces." *Trinko*, 540 U.S. at 410 n.3.[15] Here, Apple already sells iPods and iTS content separately, so avoiding Black's unprecedented theory

---

[15] For example, to avoid the tie in *Eastman Kodak*, Kodak could simply have offered to sell copier parts to anyone without requiring the purchase of service as well. 504 U.S. at 463.

of liability would require Apple to do something more than selling the two products separately. Indeed, Apple would be required not only to license Microsoft's DRM but also incorporate it into Apple's products and become dependent on Microsoft for support. No case has ever found tying liability in these circumstances. Black seeks to use tying law to circumvent the result mandated by *Trinko* that Apple has no antitrust obligation to deal with Microsoft or anyone else. This is not an appropriate application of tying law.

Even if Black had alleged that Apple refused to sell iPods and iTS content separately, and even if his theory was not in substance a refusal-to-deal claim, his allegations would still be insufficient in that he fails to allege a critical aspect of market power. "[T]he key question in establishing sufficient market power is whether the seller has some cost advantage not shared by its competitors which makes its competitors *unable* to provide the tying product ...." *See Cascade Health Solutions v. Peacehealth*, No. 05-35637, 2007 WL 2473229 at *24, n.29 (9th Cir. Mar. 6, 2007) (citing *U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610 (1977) (emphasis in original). Black does not allege that Apple has cost advantages over competitors that prevents them from offering complementary products to compete with the iPod and iTS. Indeed, several do so compete, including Microsoft's digital portable player, Zune, and complementary online music store, Zune Marketplace. *See* http://www.zune.net/en-US/meetzune/.

### D. Judge Ware's Prior Ruling Is Erroneous And Not Binding Here.

Judge Ware held that under *Murphy v. Business Cards Tomorrow, Inc.*, 854 F.2d 1202, 1204 (9th Cir. 1988), Tucker's failure to allege that she was coerced to buy an iPod or iTS music was not fatal. Nothing in *Murphy* supports that ruling. Indeed, the *Murphy* court granted summary judgment to the defendants on the ground that "the uncontradicted evidence shows that

no plaintiff was 'forced' to accept the tied product." 854 F.2d at 1204. But even if that were not the case, Judge Ware's ruling is not binding on this Court. In this Circuit, a tying plaintiff must allege that he was coerced to buy an unwanted product as a condition for buying a desired product. *Marquette Elecs.*, 931 F.2d at 822.

Judge Ware also misread *Eastman Kodak*. There, the plaintiffs could not purchase the items separately. Kodak would sell copier replacement parts to them only if they agreed to buy service from Kodak. 504 U.S. at 463. While Kodak did not impose the same condition on all customers (the fact on which Judge Ware evidently focused), Kodak did impose it on the plaintiffs. That was the tying violation in Kodak. Here, Apple makes its products separately available to **all** customers, so no unlawful tying exists for **any** customer. *Oce Printing Sys. USA, Inc. v. Mailers Data Servs.*, 760 So.2d 1037, 1045 (2000) is not to the contrary. There, the court cited *Eastman Kodak* for the proposition that individual proof of coercion is unnecessary at the liability stage. Nothing in that case supports that proposition. Moreover, *Eastman Kodak* involved an express tie conditioning the sale of copier parts on the purchase of copier service. 504 U.S. at 463. Absent an express tie, individual proof clearly is required.

III. **BLACK'S DECEPTIVE AND UNFAIR TRADE PRACTICES CLAIM FAILS FOR THE SAME REASONS AND BECAUSE HE FAILS TO ALLEGE ANY DECEPTIVE CONDUCT.**

FDUTPA prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.204(1) (2007). In determining whether conduct violates FDUTPA, a court must give "due consideration and great weight" to whether the conduct is deemed to be an unfair method of competition or deceptive under federal law. Fla. Stat. § 501.204(2) (2007). Black's FDUTPA claim is derivative of his antitrust claims and based on the same tying allegations. ¶ 61. With respect to the "unfair" prong of FDUTPA, his claim should be dismissed for the reasons discussed above. As to the "deceptive" prong, Black's claim should be dismissed

because he does not allege any deceptive conduct by Apple. He claims that "[c]onsumers are often unaware of this restriction and unlawful tying of the iPod and iTunes when they purchase the iPod or download digital files from the ITunes Store." *Id.* He does not, however, allege that Apple failed to disclose information to consumers or otherwise engaged in any conduct likely to mislead. While a deceptive practice claim under FDUTPA is not subject to the same heightened pleading requirements as a common law fraud claim, (*Davis v. Powertel, Inc.*, 776 So.2d 971, 974 (2001)), a complaint that fails to allege any deceptive conduct at all clearly fails to state a claim.

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed without leave to amend.

Respectfully submitted,

/s/ Janet T. Munn
Florida Bar No. 501281
jmunn@ebglaw.com
EPSTEIN BECKER & GREEN, P.C.
200 S. Biscayne Boulevard, Suite 2100
Miami, FL 33131
Tel: 305-375-7592
Fax: 305-982-1521
and
Robert A. Mittelstaedt (California Bar No. 060359)
ramittelstaedt@jonesday.com
Tracy M. Strong (California Bar. No. 221540)
tstrong@jonesday.com
Lara Kollios (California Bar No. 235395)
lkollios@jonesday.com
JONES DAY
555 California Street
26th Floor
San Francisco, California 94104
Telephone: 415-875-5710
Fax: 415-875-5700

*Admitted Pro Hac Vice*

CASE NO.: 07-61395 CIV ZLOCH/SNOW

*Attorneys for Defendant, Apple Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this 12th day of October, 2007, a true and correct copy of the foregoing was served by filing same with the EC/CMF system, which will automatically send electronic notification to the following counsel of record:

*Counsel for Plaintiff:*
Edward R. Curtis, Esq.
William T. Cotterall, Esq.
TRIPP, SCOTT, P.A.
110 S. E. Sixth Street, 15th Floor
Fort Lauderdale, Florida 33301
Telephone: 954-525-7500
Facsimile: 954-761-8475

/s/ Janet T. Munn